UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JASON HALE, *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> CITY OF SOUTH BEND, INDIANA, ) <br> *et al.*, ) <br> ) <br> Defendants. ) | Cause No. 3:16-cv-24-RLM |

OPINION AND ORDER

On April 10, 2014, Jason Hale was detained by the South Bend Police Department based on a witness identification of Mr. Hale as involved in a shooting that killed a two-year-old child the day before. J.H., Mr. Hale's then fourteen-year-old sister, was arrested due to an alleged battery of an officer in connection with the detainment of Mr. Hale and subsequent protective sweep of the residence. Jason and J.H. now sues the police officers, St. Joseph County and the City of South Bend for allegedly violating Mr. Hale's state and federal constitutional rights. The defendants move for summary judgment with respect to all claims. The court heard argument on May 24 and now grants the motion.

I. BACKGROUND

In the course of the investigation into the infant's killing, a man named Tyre M. Bradbury was identified as a suspect and arrested. While in police custody, Mr. Bradbury was interviewed by Detective Cook with the St. Joseph

County Metro Homicide Unit. While being driven to the Metro Homicide Unit's office, Mr. Bradbury identified a green Volkswagen Beetle that Mr. Bradbury described as belonging to the girlfriend of a man called "Ace"; Mr. Bradbury identified "Ace" as the person he was shooting guns with in a nearby park just before the infant was killed. Detective Cook radioed officers with the South Bend Police Department and asked that they stop the Volkswagen.

Officer Taylor found the Volkswagen parked in front of 1342 E. Chalfant Street. The Volkswagen was unoccupied, but a Kia Optima with two white females in it was in front of the Volkswagen. Officer Taylor stopped the Kia. Officer Drury arrived shortly after for backup. While Officer Taylor was speaking to the occupants of the Kia, Officer Drury saw a female come out of 1342 E. Chalfant Street, and begin to approach the Volkswagen. Officer Drury learned that the boyfriend of the woman who had just exited 1342 E. Chalfant was inside the home.

Officer Drury drew his weapon and began to move toward the home, and Officer Taylor followed suit. Other officers who had arrived on scene assisted Officers Drury and Taylor and the house was surrounded. Before the officers knocked on the door and attempted making any kind of entry into the home, Mr. Hale left the home through the front door. At the time Mr. Hale came out of the home, the officers had information that the Volkswagen's owner was the girlfriend of one of the suspects in the murder, and the owner of the Volkswagen had said that her boyfriend was inside the home.

The officers ordered Mr. Hale to lie on the ground, and he complied immediately without any confrontation or issue. Officer Drury handcuffed Mr. Hale. Detective Cook arrived at the scene with Mr. Bradbury, who was still in Detective Cook's custody. Mr. Bradbury pointed to man being detained and identified that person as "Ace," whom police learned to be Mr. Hale. Upon receiving word that this was "Ace," the officers placed Mr. Hale in a police vehicle.

Mr. Hale argues that Detective Cook had the complete ability to corroborate the information that he was being given about the identity of "Ace" apart from what Tyre Bradbury was relaying to him. Detective Cook interviewed multiple non-involved eye witnesses to the shooting, and never asked any of them for a physical description of the alleged assailants.

The South Bend Police transported Mr. Hale to the Metro Homicide Unit's office for questioning, and had no contact with Mr. Hale after that, other than to take the handcuffs off Mr. Hale. Once Mr. Hale was placed in the police vehicle, the officers determined that they needed to perform a protective sweep of 1342 E. Chalfant Street.

The officers had been told at their roll call that "Ace" might be with a second suspect, Cedric Washington, who was potentially armed and dangerous. When Mr. Hale was arrested, many officers and civilians were in the area directly outside of the home. The officers also learned that minor children—fourteen-year-old J.H. and a two year old – were in the residence. The officers at the front door called for J.H. and asked for her to get her two year old brother and step

outside the home. J.H. complied, and the police entered the house with their guns drawn. Chelsea Betts, Mr. Hale's girlfriend, told J.H. the police were weren't supposed to go inside the home without a warrant, so J.H. went back into the home.

J.H. told the police officer in the front room that they had to get out of her house, and the officer told her to "shut up." Officer Napolitan then began to pull J.H. out of the house while she held onto the couch and then the front door frame. Officer Baker then threw J.H. to the ground, handcuffed her and placed her in a police vehicle, where she remained until Officer Baker took her first to the Metro Homicide Unit, and then to the Juvenile Justice Center. J.H. testified in her deposition that she was trying to stop the police from removing her from the home after she had reentered.

In the second amended complaint filed on April 7, 2017 [Doc. No. 27], the Hales assert federal claims for unlawful search and seizure, excessive force and false arrest, and claims under Indiana law for assault and battery, excessive force, intentional infliction of emotional distress, false arrest, false imprisonment and trespass.

The Hales also filed claims against St. Joseph County under Section 1983 and Indiana common law for false arrest, false imprisonment, and other intentional torts based upon the "information and belief" that Commander Corbett was present at the Hale household to affect the arrest and that Mr. Cotter and/or Commander Corbett commanded Mr. Hale's detention. Because the

plaintiffs no longer pursue an excessive force case with respect to J.H., the court will only address the claims with respect to Jason Hale.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, 477 U.S. at 255; Weigle v. SPX Corp., 729 F.3d 724, 730 (7th Cir. 2013). The existence of an alleged factual dispute, by itself, won't defeat a summary judgment motion; "instead, the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); see also FED. R. CIV. P. 56(e)(2). "[S]ummary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party

must show what evidence it has that would convince a trier of fact to accept its version of events." Steen v. Myers, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005)).

III. DISCUSSION

When viewed in the light most favorable to Mr. Hale, the non-moving party, with all reasonable inferences drawn in his favor, the record doesn't support a basis of discrimination under federal or state law.

Mr. Hale is right that the South Bend Police Officers lacked probable cause to arrest Mr. Hale when he stepped outside the home, but that isn't enough to establish a triable issue of fact. The reasonableness inquiry is an objective one in which the court must judge the particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 592 (7th Cir. 1997) (*quoting* Graham v. Connor, 490 U.S. 386, 396 (1989)).

The officers didn't have the Bradbury identification when Mr. Hale stepped outside the home. But they had an articulable suspicion that they might be looking at one of the shooters of a two-year-old child, so they had grounds to detain him for further inquiry.

"Once a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect." Abbott v. Sangamon County, Ill., 705 F.3d 706, 716 (7th Cir. 2013) (*quoting* Mustafa v.

City of Chicago, 442 F.3d 544, 548 (7th Cir. 2006)); *see also* Sow v. Fortville Police Dept., 636 F.3d 293, 302 (7th Cir. 2011) ("When an officer receives information from a third party whom it seems reasonable to believe is telling the truth, the officer has probable cause to effectuate an arrest."); Capps v. State, 229 N.E.2d 794, 796 (Ind. 1967) ("A police officer may base his belief that there is reasonable and probable cause for arresting a person on information received from another."). Statements from an accomplice often establish probable cause. Eain v. Wilkes, 641 F.2d 504, 510 (7th Cir. 1981). Importantly, "[p]robable cause doesn't depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters." Abbott v. Sangamon County, Ill., 705 F.3d at 716 (*quoting* Gramenos v. Jewel Cos., Inc., 797 F.2d 432, 439 (7th Cir. 1986)).

    The information Detective Cook had, at least at that point, justified a reasonably prudent person in thinking that a crime had been committed and that Mr. Hale, or "Ace" (as he was thought to be known) was involved. The arrest—taking Mr. Hale into custody to take him to the station—came after Detective Cook notified the officers on Chalfant Street that Mr. Bradbury had identified the handcuffed man as "Ace." Mr. Hale raises various points that indicate that Mr. Bradbury was mistaken or worse, but at that point, the only thing Detective Cook knew that might throw Mr. Bradbury into question was that a shotgun wasn't where Mr. Bradbury said it had been hidden. When Detective Cook passed along Mr. Bradbury's identification, Mr. Bradbury had

been corroborated at least in part by the description of Mr. Hale's girlfriend. The officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *See* Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 592 (7th Cir. 1997) (*citing* Graham v. Connor, 490 U.S. 386, 396 (1989)).

The plaintiffs no longer pursue an excessive force case with respect to J.H., so the only remaining federal claim is that the officers' entry into the house was an unreasonable search. "Warrantless searches and seizures within a home violate the Fourth Amendment's prohibition against unreasonable searches and seizures unless they fall into one of the numerous exceptions, including protective sweeps." United States v. Starnes, 741 F.3d 804, 807 (7th Cir. 2013) (*citing* Kentucky v. King, 563 U.S. 452, 459-460 (2011)). A "protective sweep" is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It's narrowly confined to a cursory visual inspection of places in which a person might be hiding. Maryland v. Buie, 494 U.S. 325, 327 (1990).

Officers conducting an in-home arrest can perform a limited, protective sweep as long as they possess a "reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." United States v. Tapia, 610 F.3d 505, 510 (7th Cir. 2010). A protective sweep is not justified where there is a "mere inchoate and unparticularized suspicion or hunch" of danger. Id. In order to limit the scope of

a protective sweep, the search "may extend only to a cursory inspection of those spaces where a person may be found" and may "last no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. In determining the reasonableness of the protective sweep, an individual's Fourth Amendment interest (expectation of privacy) must be balanced against legitimate governmental interests. Id.

A protective sweep can be conducted under the circumstances on Chalfant Street that day: one person thought to be a shooter was arrested at the front door of a house, other people in and around the house, and reason to think another person who might be armed might be in the house. Mr. Hale notes that the officers didn't proceed immediately to perform a protective sweep even though other people were close to the house. But the legality of a search is an objective question. At that point, if the Fourth Amendment allowed the protective sweep, it was constitutional even if the officers were doubtful about how dangerous the situation was.

Based on the court's analysis on the federal claims, the City or County officers and their employers aren't liable under Monell v. Department of Social Services. Governmental entities can't be held liable for the unconstitutional acts of their employees unless those acts were carried out pursuant to an official custom or policy. Grieveson v. Anderson, 538 F.3d 763, 771 (7th Cir. 2008) (*citing* Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 765 (7th Cir. 2006); Monell

v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). "In order to survive summary judgment on a §1983 official-capacity claim, the plaintiff must present evidence demonstrating the existence of an "official policy, widespread custom, or deliberate act of a [city] decision-maker of the municipality or department." Grieveson v. Anderson, 538 F.3d at 771 (*citing* Wagner v. Washington County, 493 F.3d 833, 836 (7th Cir. 2007)). "Further, the plaintiff must show that the official policy or custom was the cause of the alleged constitutional violation—the 'moving force' behind it." Id. (citations omitted). Drawing all reasonable inferences in Mr. Hale's favor, the record doesn't reflect a constitutional violation, policy, custom, or deliberate act that would direct the City or County officers to deprive Mr. Hale of his Fourth Amendment right.

What's left are the state law claims. The court of appeals encourages district courts to dismiss supplemental state law claims once all the federal claims are disposed of, so the state courts can resolve questions of state law. Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir. 1999) ("it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). No reason exists in this case to resist that encouragement.

11
CONCLUSION

For the foregoing reasons, the court GRANTS the defendants' motions for summary judgment [Doc. Nos. 76 and 83]. The Clerk shall enter judgment accordingly.

SO ORDERED.

Dated: <u>July 18, 2018</u>

<u>  /s/ Robert L. Miller, Jr.</u>
United States District Judge